[S. F. No. 19635. In Bank. Oct. 14, 1958.]

CALIFORNIA GASOLINE RETAILERS (a Nonprofit Corporation) et al., Respondents, v. REGAL PETROLEUM CORPORATION OF FRESNO, INC. (a Corporation) et al., Appellants.

846

A. E. Stebbings, C. Neil Ash, James D. Garibaldi, Frank C. Lerrigo, Eckhart A. Thompson, Martin J. Weil, Brewster L. Arms, Robert R. Rosson and A. Hugo Pearson for Appellants.

Eugene S. Clifford, Caspar W. Weinberger, Heller, Ehrman, White & McAuliffe, Philip C. Wilkins, Spencer E. Van Dyke, Smith, Van Dyke & Hildreth, David F. Crossen and Thomas B. Curtis as Amici Curiae on behalf of Appellants.

Rowell, Lamberson & Thomas, Milo E. Rowell, Richard Z. Lamberson and Breckinridge Thomas for Respondents.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, as Amici Curiae on behalf of Respondents.

CARTER, J.—The original plaintiff in this action for injunctive relief was California Gasoline Retailers, a non-profit California corporation consisting of members distributing the products of the major oil companies, Standard Oil, Shell Oil, Union Oil and others. The defendants, too numerous to name individually, are members of three groups of independent service station operators. For convenience, they have been, and will be, referred to as the Regal Group, the Norwalk Group and the Beacon Group.

Plaintiff, some 60 of whose members were in the Fresno area where this case arose, brought suit against the defendants charging them with giving away their products in violation of the Unfair Trade Practices Act (Bus. & Prof. Code, §§ 17000-17101) ; with fraudulent and misleading advertising; and with conducting a lottery in violation of sections 320, 321 and 322 of the Penal Code. The trial court found in favor of defendants on the causes of action charging unfair trade practices and fraudulent advertising, but in favor of the plaintiff on the cause of action charging them with conducting a lottery. After the evidence had been concluded and both parties had rested, the plaintiff made a motion for leave to file an amendment to the complaint and to add one Philip M. Hudson as a party plaintiff. Hudson was president of plaintiff corporation and one of its members. Plaintiff's motion was denied with the court reserving the right to alter its ruling if it could be done without prejudice to the defendants. On the day the decision was rendered, the court granted plaintiff's motion to amend.

All defendants appeal, contending that (1) the plaintiff corporation was not a proper party plaintiff; (2) the court abused its discretion in permitting the amendment and joinder of Hudson as a plaintiff; (3) their advertising and merchandising program did not constitute a lottery as defined by section 319 of the Penal Code; (4) equity will not enjoin the commission of a crime unless the activities constitute a public nuisance, or direct pecuniary loss has been sustained by the plaintiff.

It is also contended that article IV, section 26, of the California Constitution evidences a strong public policy against lotteries in this state. That section, so far as is here pertinent, provides: "The Legislature shall have no power to authorize lotteries or gift enterprises for any purpose and shall pass laws to prohibit the sale in this State of lottery or gift enterprise tickets or tickets in any scheme in the nature of a lottery." While the section just quoted shows a legislative intention that lotteries are to be prohibited in this state, it is obvious from the language thereof that it is not a "self-enforcing" or "self-executing" provision such as is found in article I, section 14, of the Constitution (*Rose* v. *State*, 19 Cal.2d 713, 720, 721 [123 P.2d 505] ). The language shows that it was intended that the Legislature should have no power to authorize lotteries by legislation and that it was to enact legislation prohibiting lotteries. *It is also apparent*

from a reading of the provisions that a lottery is not defined. Pursuant to the mandate of the just-quoted section, the Legislature has enacted legislation defining and prohibiting lotteries and these provisions are hereinafter discussed.

### PLAINTIFF CORPORATION As PROPER PARTY PLAINTIFF;[*]
### JOINDER OF HUDSON As PARTY PLAINTIFF

Plaintiff corporation is composed of members who sell gasoline and other related products. Some 60-odd members reside in Fresno County and there are others elsewhere in the state. Plaintiff argues that it is a proper plaintiff by virtue of section 382 of the Code of Civil Procedure which provides that "... when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." Defendants contend that there was no authorization to the plaintiff corporation to bring the suit; that plaintiff corporation is not, itself, engaged in selling gasoline; that there are more defendants than plaintiffs and that it would not be impracticable to bring them before the court. It is true, as stated by defendants, that the complaint does not allege that plaintiff was authorized to bring the suit on behalf of its members. It is alleged that plaintiff's members have suffered loss of customers and loss of sales of gasoline and other products and related commodities and "have been injured in their property and businesses . . ."; that plaintiff will also suffer injury and loss by "reason of the inability of said members to pay dues and assessments and to participate as members of Plaintiff Corporation."

In *Haggerty* v. *County of Kings*, 117 Cal.App.2d 470, 477 [256 P.2d 393], the court noted: "In the present case it is alleged in the complaint that plaintiff is the secretary of the California State Federation of Labor and has been *authorized* to bring this action in a representative capacity; that the Federation and its members are engaged in peaceful picketing; that the defendants have threatened to institute and are instituting prosecution of such pickets and members under the provisions of the two ordinances involved and that the members of the Federation constitute a class similarly situated with respect to the matters alleged. These allegations must be accepted as true where, as here, the demurrer to the com-

---

*This point was presented to the trial court by special demurrer and motion to dismiss.

plaint was sustained without leave to amend.'' (Emphasis added.) It would appear that the court in the Haggerty case considered an allegation as to authorization to bring the suit necessary as well as an allegation to the effect that the members represented constituted a class similarly situated. There are no such allegations in the complaint under consideration.

■ It appears that the interest of plaintiff corporation and its members may fall within the rule of *Parker* v. *Bowron,* 40 Cal.2d 344, 352, 353 [254 P.2d 6] : ''The statutory provision [Code Civ. Proc., § 382] is based upon the doctrine of virtual representation and is an exception to the general rule of compulsory joinder of all interested parties. (*Weaver* v. *Pasadena Tournament of Roses Assn.*, 32 Cal.2d 833, 837 [198 P.2d 514].) It is a codification of 'the common law theory of convenience to the parties when one or more fairly represent the rights of others similarly situated who could be designated in the controversy.' (*Fallon* v. *Superior Court,* 33 Cal.App.2d 48, 50 [90 P.2d 858].) ■ '[R]egardless of which of the alternative conditions of the statute is invoked as authorizing a class proceeding, it has been uniformly held that there must be a well-defined ''community of interest'' in the questions of law and fact involved as affecting the parties to be represented.' (*Weaver* v. *Pasadena Tournament of Roses Assn., supra*; *Jellen* v. *O'Brien*, 89 Cal.App. 505, 509 [264 P. 1115].)

''No facts have been alleged to bring Parker within this well established rule regarding class suits. He does not claim to be a member of the interested class, and there is nothing to indicate that he is 'similarly situated' with those whom he pretends to represent. There can be no 'common or general interest' in the subject matter of the controversy (*Weaver* v. *Pasadena Tournament of Roses Assn., supra*, p. 842) between Parker, who is not employed by the city, and city employees. Parker cannot give himself standing to sue by purporting to represent a class of which he is not a member.''

■ In other words, if the rule of *Parker* v. *Bowron, supra,* 40 Cal.2d 344, 352, 353, is strictly applied, there is no community of interest between plaintiff and its members and they are not ''similarly situated'' since plaintiff is complaining of the inability of its members to pay dues and assessments, and the members are alleged to have been injured by defendants through loss of business. It would thus appear that plaintiff corporation is not a proper party plaintiff.

■ The amendment to the complaint and the inclusion

of Hudson as a party plaintiff have the effect of curing the original defective pleading. Hudson is a member of plaintiff corporation and therefore "similarly situated" with the other members. Section 473, Code of Civil Procedure, provides that "The court may, in furtherance of justice, and on such terms as may be proper, allow a party to amend any pleading or proceeding by adding or striking out the name of any party. . . ." ▮ In *Feigin* v. *Kutchor*, 105 Cal.App. 2d 744, 747, 748 [234 P.2d 264], it was held that a court may, in its discretion, permit amendment of pleadings after the evidence is all in, pending argument of counsel, and even after submission of the cause. ▮ The statutory provision relating to amendments to the pleadings in the furtherance of justice has received a very liberal construction in the courts of this state (*Klopstock* v. *Superior Court*, 17 Cal.2d 13, 19 [108 P.2d 906, 135 A.L.R. 318]). ▮ The amendment to the complaint stated no new cause of action against the defendants, nor did it state any new facts. It does not appear that defendants were prejudiced thereby and the court did not abuse its discretion in permitting the amendment and inclusion of Hudson as plaintiff so that the pleadings would conform to the proof. (*Foster* v. *Keating*, 120 Cal.App.2d 435, 446 [261 P.2d 529].)

ADVERTISING AND MERCHANDISING PROGRAM AS LOTTERY

Section 319 of the Penal Code provides: "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift-enterprise, or by whatever name the same may be known."

▮ It is agreed by all parties that three elements must be present to constitute a lottery: (1) a prize; (2) distributed by chance; and (3) consideration. All parties are also agreed that the first two elements are present under the facts here presented. It is the third element of consideration upon which the parties differ.

Inasmuch as all three groups of defendants operated in slightly different ways, the facts concerning their operations will be set forth separately.

## THE REGAL GROUP

The Regal Group operates three service stations in Fresno which conduct what is known as a give-away program as part of a merchandising and advertising scheme. Tickets were distributed to the Regal stations for redistribution to the public. They were given to persons before any purchase of gasoline or other service, or whether any sale was made; they were distributed with the stubs attached from house to house; they were distributed at drive-in theaters and at baseball games. Those who received the tickets away from the stations were required to go to one of the stations to deposit the ticket stub. Rules for the drawing were posted in each Regal station and provided that any person over the age of 18 years would receive, free of charge, an officially numbered ticket; that the winner did not have to be present at the time of the drawing; and that the winning numbers would be posted for a seven-day period at the Regal stations after the periodic drawings. The prizes to be won consisted of an automobile, cash and other personal property.

## THE NORWALK GROUP

This, too, was a merchandising and advertising program and these defendants advertised in the newspaper, over the radio and by billboards that each month, commencing with May, 1955, the Norwalk stations would give away three Buick automobiles, and several household appliances. When this program was initiated, the distributors, to defray the expenses of the campaign, increased the price of gasoline to the retailers by one cent per gallon which increase was passed on to the consumers. Those Norwalk dealers who did not choose to participate in the program did not receive their gasoline at the increased rate. The Norwalk tickets were given away to anyone who asked for them regardless of whether any product or service offered for sale was purchased; tickets were also distributed from house to house, and some 5,000 of them were placed under windshield wipers of cars parked at the Fresno County Fair Grounds. One of the Norwalk dealers testified that he gave more tickets for larger purchases and that he passed along the one-cent increase in his cost of gasoline to the purchasers thereof. Another Norwalk dealer testified that he gave tickets to those driving into his station both before and after purchases. The ticket stubs were required to be deposited in a receptacle in a Norwalk station. There is evidence in the record that when Norwalk

tickets were distributed away from the stations, the stubs were first removed so that the recipient did not have to go into the station to be eligible for one of the prizes. A drawing was held once a month and the winning list was posted for seven days at all Norwalk stations participating in the program. If no claimant appeared to call for his prize during the seven-day period, the prize was then awarded to the winning number next in line. Written rules were posted at each participating station and provided (Rule 1) that "Any person who is 18 years of age or over will be given free, on request, an official numbered ticket for any drawing. Giving of such ticket is unconditional and does not depend on the purchase of or payment for any merchandise or service."

### The Beacon Group

This was a similar advertising and merchandising operation entered into by the Beacon and Caminol Company in conjunction with United Stations, Inc., an association of gasoline stations formed by the operators for the purpose of operating give-away programs. Caminol did not raise the price of gasoline to the dealers, but the dealers raised the price to the consumer by one cent per gallon and then remitted the extra one cent per gallon to Caminol to pay for the expenses and advertising of the give-away program. Tickets were distributed away from the station, to those who made no purchases at the station, and to those who did. The tickets given to persons away from the stations had the stubs attached causing the recipients to go to the station to deposit them. The rules provided that any person 18 years of age, or over, would be given free, on request, an official numbered ticket for any drawing; that the giving of the ticket was unconditional and did not depend on the purchase of any merchandise or services; that the winner did not have to be present at the drawing and that all winning numbers would be posted at the participating stations for a seven-day period. Drawings were held twice a month and prizes were distributed to those holding the winning tickets.

In *People* v. *Cardas*, 137 Cal.App.Supp. 788, 790, 791 [28 P.2d 99], it was held that "An analysis of the section [Pen. Code, § 319] and an examination of the authorities construing it and other similar statutory provisions disclose that there are three elements necessary to constitute a lottery. These elements are: (1) The disposition of property, (2) upon a contingency determined by chance, (3) *to a person who has*

*paid a valuable consideration for the chance of winning the prize, that is to say, one who has hazarded something of value upon the chance. (People v. Hecht, 119 Cal.App.Supp. 778 [3 P.2d 399]; 17 R.C.L. 1222; 38 C.J. 289.)''* (Emphasis added.) In the Cardas case the defendant was a motion picture theater operator. He advertised by means of programs, newspapers, placards and on the theater screen that on a certain date two fully paid round trip tickets to Santa Catalina Island would be given free to the holders of the lucky tickets which were to be drawn on a certain evening. The court stated the facts as follows: ''The tickets were placed in the hands of the public by the distribution in the vicinity of the theater of five thousand theater programs, each containing one of the tickets, and by handing two thousand tickets to passing motorists. Also, an employee of the theater was stationed between the street and the entrance to the theater, who gave prize tickets to all who asked them, and offered them to any person who approached within proximity of her. No charge was made for any of these prize tickets, nor was it necessary that an admission ticket to the theater be purchased.'' The winner was announced both inside and outside the theater; stubs were deposited in a receptacle outside the theater. The court noted that stubs were deposited there by persons who purchased admission tickets, by those who were admitted to the theater free of charge, and by others who did not attend the show.

In the Cardas case, as in the one under consideration, ''Counsel for the People argue that patronage from the ticket holders as a whole constituted consideration for the distribution of the prize even though the individual holders of tickets had not parted with consideration for the individual ticket held by them. This argument apparently proceeds upon the theory that the element of consideration is established by showing that the defendant received something of value in return for the distribution of the prizes. The question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of the prize tickets. The question is: Did the holders of prize tickets pay a valuable consideration for the chance? Certainly those who received prize tickets without buying an admission ticket did not pay anything for the chance of getting the prize. They did not hazard anything of value. It would then seem to follow that those who purchased admission tickets and received prize tickets, not at the box office but from another employee,

could not be said to have paid a consideration for the prize tickets since they could have received them free.''

In *People* v. *Carpenter*, 141 Cal.App.2d 884, 887, 888, 889, 890 [297 P.2d 498] (hearing denied), a bank night drawing was also involved. As an advertising technique to encourage theater patronage, the operators of Lakewood theater solicited registrations from house to house and gave registration blanks to people attending the theater who were asked if they would like to register for the bank night. Registration blanks were kept at the snack bar and sometimes at the box office and were given to anyone who asked for them. A ticket containing each number was put into a drum kept by the theater as the name to which it was assigned was placed in the registration book. Once a name was registered that person was eligible to win at any bank night held thereafter. Bank nights were held once a week and a ticket was drawn from the drum and given to the manager who compared it with the registration book. The winning name was then announced over loudspeakers within and outside the theater and the person winning was given two minutes to reach the stage and identify himself. Admission tickets were not necessary for persons wishing to enter the theater to see and hear the bank night drawing, or to go into the theater to claim the prize.

In the Carpenter case the court held that the element of chance was lacking inasmuch as under the facts of that case Carpenter, who arranged to have himself chosen as the one to draw the ticket, had palmed a ticket which he purported to draw from the drum on the stage. This was done according to a prearranged plan with two others. The court stated the ''initial question'' to be ''Was the bank night drawing a lottery?'' And after holding that the element of chance was missing due to the fraud of Carpenter, continued: ''We come now to the third element in a lottery, viz: consideration for the chance of winning the prize. The question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of prize tickets. The question is: Did the holders of prize tickets pay a valuable consideration for the chance? Certainly those who received prize tickets without buying an admission ticket did not pay anything for the chance of getting the prize. They did not hazard anything of value. It would then seem to follow that those who purchased admission tickets and received prize tickets, not at the box office but from another employee, could

not be said to have paid a consideration for the prize tickets since they could have received them free.

"The court in the Cardas case, *supra*, relied on *Cross* v. *People*, 18 Colo. 321 [32 P. 821, 36 Am.St.Rep. 292]. In discussing the element of consideration in a lottery, the Colorado Supreme Court stated: 'By the admitted facts it is shown that the plaintiffs in error gave business cards which entitled the holders to a chance on a piano, to be distributed as the holders of such chances might elect. These tickets or chances were given indiscriminately to persons, whether they purchased goods of plaintiffs in error or not, to those who registered their names at their shoe store, and to those who, from a distance, sent the return postage. While it is admitted that Charles Linton purchased goods to the amount of one dollar at their store, and received one of these cards, it is admitted that such purchase, or any purchase of goods, was not a condition upon which the card was delivered. The fact that such cards or chances were given away to induce persons to visit their store with the expectation that they might purchase goods, and thereby increase their trade, is a benefit too remote to constitute a consideration for the chances. Persons holding these cards, although not present, were, equally with those visiting their store, entitled to draw the prize. The element of gambling that is necessary to constitute this a lottery within the purview of the statute, to wit, the paying of money, directly or indirectly, for the chance of drawing the piano, is lacking, and the transaction did not constitute a violation of the statute.' " In holding that the element of consideration was also lacking the court had this to say: "Certainly those who registered upon request of a solicitor without attending the theater did not pay for the chance of getting the prize; neither did those who later registered without purchasing an admission ticket. Those who purchased admission tickets and then registered while they were at the theater as patrons, cannot be said to have paid a consideration for the privilege of registering, as they could have done so without buying an admission ticket. Once a person's name was registered, it might be drawn at any bank night thereafter, and it was not necessary that he purchase an admission ticket either to listen to or see the bank night drawing or to claim the award if his name was called.

"It therefore follows, under the principles of the Cardas case, *supra*, that no consideration was paid for the chance of winning the bank night prize in the instant case."

In the case at bar all three groups of defendants engaged in the so-called give-away programs as an advertising scheme and to bring new patronage to their service station. In all groups, prize tickets were given away free to anyone who asked for them, and to many who did not ask for them; in all groups the tickets were given to persons away from the stations; in all groups the receipt of the ticket or tickets was not dependent upon a purchase of merchandise or service and in all groups the prize winning tickets were honored regardless of a purchase of merchandise. The Norwalk and Beacon Groups raised the price of gasoline one cent per gallon to the consumer in order to finance the advertising program. However, in both of these groups tickets were given away free without respect to the purchase of any gasoline or other related products.

The People, as amicus curiae, make the following point: It is contended that there are two types of advertising schemes—"closed participation" and "flexible participation." A closed participation scheme is where those participating in the scheme have paid a consideration for a chance to win the prize; the flexible participation type is where some have paid a consideration and some have not. As in the case at bar, there were some customers of the gasoline stations who received prize tickets after purchase of the products offered for sale, and others who received the tickets at their homes, or at other places, and paid for no merchandise. In this latter connection, the argument is made that in all of the groups the major part of the tickets went to those who made purchases. It is pointed out that in *People* v. *Gonzales,* 62 Cal.App.2d 274, 278, 279, 285, 286 [144 P.2d 605], the theater manager testified that one cash night prize ticket was given to each patron who purchased a ticket when he purchased the ticket and another was given to him as he left the theater. No tickets were distributed to persons who had not purchased admission tickets. The court noted that "There was no general or indiscriminate distribution of the drawing tickets to persons irrespective of whether they paid admission." The court, after discussing the Cardas case, *supra* (137 Cal.App.Supp. 788), stated: "The decision in the Cardas case was a proper determination upon the facts therein that the drawing therein was not a lottery. That decision, however, is not determinative or at all persuasive that the drawing herein, involving facts vastly different from those

therein, was not a lottery. The presence of certain facts in that case, as to free distribution, and as to announcements and participation outside the theater, was the basis for the decision therein that the drawing was not a lottery, but in this case those or similar facts are not present and an opposite state of facts exists.'' From the court's statement that ''There was no *general* or *indiscriminate* distribution of the drawing tickets to persons irrespective of whether they paid admission'' (emphasis added) the People argue that because a lesser number of tickets in the case at bar were given to persons away from the station and to those who made no purchases that this was more like a closed participation scheme, and hence a lottery, than it was the flexible participation scheme which was found not to constitute a lottery in the Cardas case.

Since it clearly appears from the record that any person could have received a ticket, or tickets, free for the asking, or even without a request and without any necessity of making any kind of purchase it would seem that the relative numbers of tickets distributed with purchases or without purchases should not be determinative of the issue involved which is whether the holder, or holders, of the tickets paid, or promised to pay a valuable consideration for the chance of winning a prize. As the court stated in the Carpenter case, *supra* (141 Cal.App.2d 884, 888) : ''It would then seem to follow that those who purchased admission tickets and received prize tickets, not at the box office but from another employee, could not be said to have paid a consideration for the prize tickets since they could have received them free.'' Also, in the Carpenter case (p. 889), the court, quoting from *Cross* v. *People,* 18 Colo. 321 [32 P. 821, 36 Am.St.Rep. 292], stated that '' '. . . The element of gambling that is necessary to constitute this a lottery within the purview of the statute, to wit, the paying of money, directly or indirectly, for the chance of drawing the piano, is lacking, and the transaction did not constitute a violation of the statute.' ''

Plaintiffs and amicus curiae both argue that *People* v. *Gonzales,* 62 Cal.App.2d 274 [144 P.2d 605], laid down the rule that a closed participation program and thus a lottery exists where the distribution of tickets to persons other than customers is not ''substantial'' or is ''negligible'' in comparison with those distributed to customers. This rule, it is contended, has ''emasculated'' the holding of *People* v. *Cardas,* 137 Cal.App.Supp. 788 [28 P.2d 99]. In view of the holding

in *People* v. *Carpenter*, 141 Cal.App.2d 884, 889, 890 [297 P.2d 498], that "Certainly those who registered upon request of a solicitor without attending the theater did not pay for the chance of getting the prize; neither did those who later registered without purchasing an admission ticket. Those who purchased admission tickets and then registered while they were at the theater as patrons, cannot be said to have paid a consideration for the privilege of registering, as they could have done so without buying an admission ticket," it would appear that this argument is without merit. If any person could receive a ticket or tickets without paying anything therefor, it would appear that the question of consideration should not rest on the percentage of those receiving tickets with purchases as opposed to those receiving tickets without such purchases.

Reliance is also placed on *Holmes* v. *Saunders*, 114 Cal.App. 2d 389, 390, 391 [250 P.2d 269], where tickets for a drawing where an automobile was the prize, were distributed to all those who paid $1.00 for a six months' subscription to the "Associated Bulletin." It was there said: "The consideration to make such a transaction a lottery need not be paid exclusively for the chance to win the prize. It is sufficient that the consideration, as here, be paid for something else and the chance to win the prize. (*People* v. *Gonzales*, 62 Cal.App.2d 274 [144 P.2d 605]; *People* v. *Miller*, 271 N.Y. 44 [2 N.E.2d 38]; and see the many cases collected in the notes in 48 A.L.R. 1115; 57 A.L.R. 424; 103 A.L.R. 866; 109 A.L.R. 709; 113 A.L.R. 1121.) It is said in 34 American Jurisprudence 650 'that no sooner is the term "lottery" defined by a court, than ingenuity evolves some scheme within the mischief discussed, although not quite within the letter of the definition given; but an examination of the many cases on the subject will show that it is very difficult, if not impossible, for the most ingenious and subtle mind to devise any scheme or plan, short of a gratuitous distribution of property, which has not been held by the courts of this country to be in violation of the lottery laws. . . . The court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited. . . .' "

Several cases from other states are cited by the People in an endeavor to show that the promotional scheme here involved did constitute a lottery. One somewhat factually similar is *Featherstone* v. *Independent Service Stations Assn.*, (Tex. Civ. App.) 10 S.W.2d 124, 125, 126, 127, where a prize

ticket was distributed for each $1.00 spent by a customer of a service station. Apparently the plan was changed and some tickets were distributed to persons who did not make purchases of merchandise or service. The Texas court noted that a lottery was not defined by the laws of Texas and adopted the definition set forth in *State* v. *Lipkin,* 169 N.C. 265 [84 S.E. 340, 342, L.R.A. 1915F 1018, Ann.Cas. 1917D 137]: "A lottery, for all practical purposes may be defined as any scheme for the distribution of prizes, by lot or chance, by which one, on paying money or giving any other thing of value to another, obtains a token, which entitles him to receive a larger or smaller value or nothing, as some formula of chance may determine." The court said: "While dealers, under the new plan, distributed tickets to noncustomers as well as to customers, it seems that the scheme was to distribute tickets, in the main to customers, as the evidence discloses that only a few, negligible in number, were given to persons other than customers. That the giving of tickets, and the drawings and distribution of prizes, were inducements to patronage and unquestionably lured customers, is shown from the very satisfactory business results that followed. *Patronage thus induced was the consideration that passed from the ticket holder for the chance received,* in that the price paid, whatever it was, the amount being immaterial, constituted the aggregate price for the merchandise or service and the ticket that represented a chance to win the prize; in other words, for one undivided price both were purchased, the merchandise, or service, and ticket, the ticket being as much bought as though priced separately." (Emphasis added.) In other words, the court held that the *benefit flowing to the sponsor* of the scheme was the consideration which made the scheme a lottery. The Cardas case, *supra,* held that "The question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of the prize tickets" and section 319 very clearly so states: That it is the distribution of property by chance "among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it."

The People also cite *Federal Communications Com.* v. *American Broadcasting Co.,* 347 U.S. 284, 293, 294 [74 S.Ct. 593, 98 L.Ed. 699], where radio give-away programs were involved. The statute there involved (18 U.S.C. § 1304) provided: "Whoever broadcasts by means of any radio station for which a license is required by any law of the United

States, or whoever, operating any such station, knowingly permits the broadcasting, of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined. . . .'' Examples of the give-away programs were listed as "Stop the Music," "What's My Name" and "Sing it Again." The court, speaking through Mr. Chief Justice Warren, stated that the Federal Communications Commission "contends that consideration in the form of money or a thing of value is not essential, and that a commercial benefit to the promoter satisfies the consideration requirement . . ." and that the section involved did not define the type of consideration necessary. The court held: "We find no decisions precisely in point on the facts of the cases before us. The courts have defined consideration in various ways, but so far as we are aware none has ever held that a contestant's listening at home to a radio or television program satisfies the consideration requirement. Some courts—with vigorous protest from others—have held that the requirement is satisfied by a 'raffle' scheme giving free chances to persons who go to a store to register in order to participate in the drawing of a prize, and similarly by a 'bank night' scheme giving free chances to persons who gather in front of a motion picture theater in order to participate in a drawing held for the primary benefit of the said patrons of the theatre. But such cases differ substantially from the cases before us. To be eligible for a prize on the 'give-away' programs involved here, not a single home contestant is required to purchase anything or pay an admission price *or leave his home to visit the promoter's place of business;* the only effort required for participation is listening." (Emphasis added.) The People rely on the italicized portion of the above-quoted statement as a holding that when a participant is required to go to the sponsor's place of business to deposit his prize ticket stub the necessary consideration is established. The Supreme Court also noted that "We believe that it would be stretching the statute to the breaking point to give it an interpretation that would make such programs a crime." In view of our statute (Pen. Code, § 319) defining a lottery and which provides that the consideration necessary is a "valuable one" paid, or promised to be paid by the one receiving the ticket,

the fact that a ticket holder must go to the place of business of the sponsor of the scheme to deposit the ticket stub cannot be considered the necessary consideration.

We are also urged by the People to consider section 1605 of the Civil Code in defining the consideration necessary under the lottery statutes. That section provides that "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." It would again appear that, in view of the plain provisions of section 319 of the Penal Code, in order to constitute consideration within the definition of a lottery there must be a valuable consideration paid, or promised to be paid *by the ticket holder*. (*People* v. *Carpenter*, 141 Cal.App.2d 884 [297 P.2d 498].) We held in *De Mille* v. *American Fed. of Radio Artists*, 31 Cal.2d 139, 156 [187 P.2d 769, 175 A.L.R. 382], that "Penal statutes will not be given application beyond their plain intent. Such acts include only those offenses coming clearly within the import of the language." The "realistic approach" to the consideration necessary to constitute a promotion scheme a lottery which is urged upon us by the People in asking us to accept the definition of consideration as found in section 1605 of the Civil Code would seem to be an argument which should be directed to the Legislature rather than to this court.

It is our conclusion that defendants' advertising and promotional scheme did not fall within the definition of a lottery as set forth in section 319 of the Penal Code because of the lack of consideration.

The portions of the judgment appealed from are reversed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.